**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| PATRICK AYERS Derivatively on Behalf of SUNNOVA ENERGY INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM J. BERGER, ROBERT L. LANE, ANNE SLAUGHTER ANDREW, NORA MEAD BROWNELL, RAHMAN D'ARGENIO, AKBAR MOHAMED, MICHAEL C. MORGAN, C. PARK SHAPER, MARY YANG, DOUGLAS W. KIMMELMAN, and MARK LONGSTRETH <br><br> Individual Defendants, <br><br> -and- <br><br> SUNNOVA ENERGY INTERNATIONAL, INC. a Delaware corporation, <br><br> Nominal Defendant. | Case No. 4:24-cv-2294 <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Patrick Ayers ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal

Defendant Sunnova Energy International, Inc. ("**Sunnova**" or the "**Company**") submits this

Verified Stockholder Derivative Complaint against individual defendants William J. Berger,

Robert L. Lane, Anne Slaughter Andrew, Nora Mead Brownell, Rahman D'Argenio, Akbar

Mohamed, Michael C. Morgan, C. Park Shaper, Mary Yang, Douglas W. Kimmelman, and Mark

Longstreth (collectively, the "**Individual Defendants**") for their breaches of fiduciary duties as

directors and/or officers of Sunnova, unjust enrichment, and violations of Sections 14(a) and 20(a)

of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff alleges the following upon

information and belief, except as to the allegations specifically pertaining to Plaintiff, which are

based on personal knowledge. This complaint also is based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Sunnova against members of its board of directors (the "**Board**") and members of the Company's upper management. The wrongdoing alleged herein caused substantial damage to Sunnova's reputation, goodwill, and standing in the business community.  The malfeasance also exposed Sunnova to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of law outlined herein have damaged Sunnova in the form of, among other things, millions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by Sunnova's directors and officers from February 25, 2020, through the present (the "**Relevant Period**").

2.      According to the Company's website, Sunnova "is an industry-leading adaptive energy services company focused on making clean energy more accessible, reliable, and affordable for homeowners and businesses.[1] Through its energy platform, Sunnova claims it provides better energy service at a more competitive price."

3.      As of May 2024, the Company provides services to approximately 438,000 customers.

---

[1] *See* Sunnova Company website at https://www.sunnova.com/about-sunnova, last visited 6/12/2024.

4.      In September 2023, Sunnova entered into a partial loan guarantee agreement with the U.S. Department of Energy's ("**DOE**") Loan Programs Office ("**LPO**") in the amount of $3.0 billion to support solar loans originated by Sunnova under a new solar loan channel named Project Hestia (the **"LPO Loan" or** "**Project Hestia**"). In a press release detailing the LPO Loan, Sunnova stated that Project Hestia was expected to "provide disadvantaged homeowners and communities with increased access to clean, flexible power via Sunnova services by indirectly and partially guaranteeing the cash flows associated with consumers' loans" and that Sunnova's "purpose-built technology" was "designed to improve customers insights regarding their power usage and will facilitate demand response behavior."

5.      Sunnova promised homeowners a brighter future with its cutting-edge solar panels, which were supposed to save money and help the environment. Despite this seemingly admirable intent, the reality was starkly different.  Sunnova's business practices, instead, prompted hundreds of customer complaints regarding its solar energy systems, including assertions that the systems function poorly, there were massive delays in installation, and poor customer service in response to these problems.

6.      Customers also reported issues with the contracts they signed with Sunnova, including the inclusion of misleading terms, unexpected fees, and difficulties in canceling contracts or transferring them to new homeowners.  The Company's representatives are also accused of pushing misleading sales practices, exaggerating the purported cost savings on electricity bills, and, in some instances, predatory sales practices that targeted the elderly.

7.      The Company's misconduct alarmed Congress. On December 8, 2023, Representative Cathy McMorris Rodgers ("**Rodgers**"), Chair of the U.S. House Committee on Energy and Commerce (the "**House Energy Committee**"), and Senator John Barrasso

("**Barrasso**"), ranking member of the U.S. Senate Committee on Energy and Natural Resources (the "**Senate Energy Committee**"), sent a letter to the DOE and Sunnova seeking information related to the LPO Loan and Project Hestia following the release of the "disturbing" reports regarding the Company. Specifically, the letter demanded additional information regarding the LPO's awareness and treatment of Sunnova's allegedly predatory business practices.

8.      On this news, Sunnova's stock price fell 16.12%, or $2.00 per share, to close at $10.41 per share on December 8, 2023.  As of June 14, 2024, the Company trades below $6 per share.

9.      This action alleges that throughout the Relevant Period the Individual Defendants breached the fiduciary duties they owe to the Company and its stockholders when they made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Sunnova routinely engaged in predatory business practices targeting disadvantaged homeowners and communities, the very same groups that Project Hestia was created to benefit; (ii) the forgoing conduct subjected the Company to a heightened risk of regulatory and/or governmental scrutiny, as well as significant reputational and/or financial harm; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times. Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

10.     Moreover, as detailed herein, and as alleged in the ongoing federal securities class action in the Southern District of Texas styled *Trinidade v. Sunnova Energy International Inc. et al.*, Case 4:24-cv-00569 (the "**Securities Class Action**"), Sunnova's officers and directors substantially damaged the Company by filing false and misleading statements and omissions in violation of federal law and subjecting the Company to Congressional investigation.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13.     The court has personal jurisdiction over each defendant named herein because each Defendant is either a corporation that conduct business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

14.     Venue is proper in this District because the Company is incorporated in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

15.     Plaintiff Patrick Ayers is and has continuously been a stockholder of the Company during the wrongdoing complained of herein.

### Nominal Defendant

16.     Defendant Sunnova is a Delaware corporation with its principal executive offices located at 20 East Greenway Plaza, Suite 540, Houston, Texas 77046. Sunnova's shares trade on the New York Stock Exchange ("**NYSE**") under the ticker symbol "NOVA".

### Individual Defendants

17.     Defendant William J. Berger ("**Berger**") is the Company's founder and has served as Sunnova's President, Chief Executive Officer, and member of the Board since April 2019. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, Berger was reported to receive $5,865,040 in total compensation for his role in the Company for the 2023 Fiscal Year. For the 2022 Fiscal Year, he was reported to receive $5,358,001 in total compensation. For the 2021 Fiscal Year, he was reported to receive $1,465,350 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2020 fiscal year, he was reported to receive $1,593,926 in total compensation. During the Relevant Period, Berger sold approximately $4.5 million worth of Sunnova stock on the basis of adverse, material non-public information ("**MNPI**").

18.     Defendant Robert L. Lane ("**Lane**") served as the Company's CFO and Executive Vice President since May 2019 and is expected to depart from his role in the Company on June 30, 2024. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, Lane was reported to receive $2,359,850 in total compensation for his role in the Company for the 2023 Fiscal Year. For the 2022 Fiscal Year, he was reported to receive $2,152,358 in total compensation.

For the 2021 Fiscal Year, he was reported to receive $1,800,106 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2020 fiscal year, he was reported to receive $1,653,098 in total compensation.

19.     Defendant Anne Slaughter Andrew ("**Andrew**") served as a Company director since October 2019. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, Andrew was reported to receive $206,948 in total compensation for her role as a director for the 2023 Fiscal Year. According to the Company's Proxy Statement filed with the SEC on April 6, 2023, for the 2022 Fiscal Year, she was reported to receive $195,876 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2021 Fisal Year, she was reported to receive $196,259 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 8, 2021, for the 2020 fiscal year, she was reported to receive $176,342 in total compensation.

20.     Defendant Nora Mead Brownell ("**Brownell**") served as a Company director since October 2020. Brownell was a member of the Audit Committee for the 2020 Fiscal Year. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, Brownell was reported to receive $215,079 in total compensation for her role in the Company for the 2023 Fiscal Year. According to the Company's Proxy Statement filed with the SEC on April 6, 2023, for the 2022 Fiscal Year, she was reported to receive $202,704 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2021 Fiscal Year, she was reported to receive $189,321 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 8, 2021, for the 2020 Fiscal Year, she was reported to receive $135,000 in total compensation.

7

21.     Defendant Rahman D'Argenio ("**D'Argenio**") served as a Company director since June 2019, but has tendered his resignation as a director, effective June 28, 2024. He was appointed in connection with his affiliation with Energy Capital Partners, an investment management firm that had a greater than five percent ownership of the Company, where he is a Partner and a member of the Investment Committee. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, D'Argenio was reported not to receive anything in compensation. According to the Company's Proxy Statement filed with the SEC on April 6, 2023, for the 2022 Fiscal Year, he was not reported to receive anything in compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2021 Fiscal Year, he was not reported to receive anything in compensation. According to the Company's Proxy Statement filed with the SEC on April 8, 2021, for the 2020 Fiscal Year, he was not reported to receive anything in compensation. Through his affiliation with Energy Capital Partners, during the Relevant Period, Defendant D'Argenio sold over $782 million worth of Sunnova stock on the basis of MNPI.

22.     Defendant Akbar Mohamed ("**Mohamed**") served as a Company director since December 2020. He is also a member of the Audit Committee. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, Mohamed was reported to receive $197,113 in total compensation for his role as a director for the 2023 Fiscal Year. According to the Company's Proxy Statement filed with the SEC on April 6, 2023, for the 2022 Fiscal Year, he was reported to receive $193,555 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2021 Fiscal Year, he was reported to receive $190,000 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 8, 2021, for the 2020 Fiscal Year, he was reported to receive $120,000 in compensation.

23.     Defendant Michael C. Morgan ("**Morgan**") served as a Company director since June 2019. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, Morgan was reported to receive $186,411 in total compensation for his role as a director for the 2023 Fiscal Year. According to the Company's Proxy Statement filed with the SEC on April 6, 2023, for the 2022 Fiscal Year, he was reported to receive $201,056 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2021 Fiscal Year, he was reported to receive $197,500 in total compensation. During the Relevant Period, Morgan sold over $6.4 million worth of Sunnova stock on the basis of MNPI.

24.     Defendant C. Park Shaper ("**Shaper**") served as a Company director since June 2019 and is also a member of the Audit Committee. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, Shaper was reported to receive $199,456 in total compensation for the 2023 Fiscal Year. According to the Company's Proxy Statement filed with the SEC on April 6, 2023, for the 2022 Fiscal Year, he was reported to receive $205,000 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2021 Fiscal Year, he was reported to receive $205,000 in total compensation. During the Relevant Period, Shaper sold over $13.9 million worth of Sunnova stock on the basis of MNPI.

25.     Defendant Mary Yang ("**Yang**") served as a Company director since October 2021 and is also a member of the Audit Committee. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, Yang was reported to receive $192,342 in total compensation for the 2023 Fiscal Year. According to the Company's Proxy Statement filed with the SEC on April 6, 2023, for the 2022 Fiscal Year, she was reported to receive $196,679 in total compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2021 Fiscal Year, she was reported to receive $120,000 in total compensation.

26.     Defendant Douglas W. Kimmelman ("**Kimmelman**") served as a Company director from June 2019 to December 2023. Defendant Kimmelman was appointed in connection with his affiliation with Energy Capital Partners, which he established in 2005 and where he served as its Senior Partner. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, Kimmelman was reported not to receive anything in compensation. According to the Company's Proxy Statement filed with the SEC on April 8, 2021, Kimmelman was reported not to receive anything in compensation. Through his affiliation with Energy Capital Partners, during the Relevant Period, Defendant Kimmelman sold over $782 million worth of Sunnova stock on the basis of MNPI.

27.     Defendant Mark Longstreth ("**Longstreth**") served as a Company director from June 2019 to May 2024. He was also a member of the Audit Committee and the Nominating Corporate Governance and Sustainability Committee. Longstreth is also a Partner of Newlight Partners, LP, an investment management firm with a greater than five percent ownership of the Company during the Relevant Period. According to the Company's Proxy Statement filed with the SEC on April 4, 2024, for the 2023 Fiscal Year, Longstreth was reported not to receive anything in compensation. According to the Company's Proxy Statement filed with the SEC on April 6, 2023, for the 2022 Fiscal Year, Longstreth was not reported to receive anything in compensation. According to the Company's Proxy Statement filed with the SEC on April 7, 2022, for the 2021 Fiscal Year, Longstreth was not reported to receive anything in compensation. According to the Company's Proxy Statement filed with the SEC on April 8, 2021, for the 2020 Fiscal Year, Longstreth was not reported to receive anything in compensation. Through his affiliation with Newlight Partners, LP, Defendant Longstreth sold over $201 million worth of Sunnova stock on the basis of MNPI.

28.     Collectively, Defendants Longstreth, Mohamed, Morgan, Shaper, and Yang are referred to herein as the "**Audit Committee Defendants**."

29.     Collectively, Defendants Berger, Lane, Andrew, Brownell, D'Argenio, Mohamed, Morgan, Shaper, Yang, Kimmelman, and Longstreth are referred to herein as the "**Individual Defendants**."

30.     The Individual Defendants, because of their positions with Sunnova, possessed the power and authority to control the contents of Sunnova's reports to the SEC, press releases, and presentation to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to MNPI, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Sunnova is a U.S.-based company that provides residential solar energy services including solar panel installations for homes that purportedly assist homeowners generate their own electricity from renewable sources.  The Company also states that it provides battery storage options that allow homeowners to store excess solar energy for use during times when the solar panels are not generating electricity, such as during the night or power outages. The Company also states it provides various financing options, including leases, power purchase agreements and loans, allegedly making it more affordable for homeowners to adopt solar energy.

**The Individual Defendants' False and Misleading Statements**

32.     The Relevant Period begins on February 25, 2020, when Sunnova filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2019 (the "**2019 10-K**"). In providing an overview of the Company, the 2019 10-K stated, in relevant part:

> We are a leading residential solar and energy storage service provider, serving more than 80,000 customers in more than 20 United States ("U.S.") states and territories. Our goal is to be the leading provider of clean, affordable and reliable energy for consumers, and we operate with a simple mission: to power energy independence. We were founded to deliver customers a better energy service at a better price; and, through our solar and solar plus energy storage service offerings, we are disrupting the traditional energy landscape and the way the 21st century customer generates and consumes electricity.

> We have a differentiated residential solar dealer model in which we partner with local dealers who originate, design and install our customers' solar energy systems and energy storage systems on our behalf. Our focus on our dealer model enables us to leverage our dealers' specialized knowledge, connections and experience in local markets to driver customer origination while providing our dealers with access to high quality products at competitive prices and technical oversight and expertise. We believe this structure provides operational flexibility, reduced exposure to labor shortages and lower fixed costs relative to our peers, furthering our competitive advantage.

> We offer customers products to power their homes with affordable solar energy. We are able to offer savings and storage opportunities to most customers compared to utility-based retail rates with little to no up-front expense to the customer, and we are able to provide energy resiliency and reliability to our solar plus energy storage customers. Our solar service agreements take the form of a lease, power purchase agreement ("PPA") or loan. The initial term of our solar service agreements is typically either 10 or 25 years. Service is an integral part of our agreements and includes operations and maintenance, monitoring, repairs and replacements, equipment upgrades on-site power optimization for the customer (for both supply and demand), the ability to efficiently switch power sources among the solar panel, grid and energy storage system, as appropriate, and diagnostics. During the life of the contract, we have

the opportunity to integrate related and evolving home servicing and monitoring technologies to upgrade the flexibility and reduce the cost of our customers' energy supply.

33.     Further, in discussing the Company's customer agreements, the 2019 10-K stated, in relevant part:

> We focus on growing a geographically diverse customer base with strong credit profile. We perceive our recurring customer payments as high-quality assets given the broad and relatively inelastic demand for electricity and because our customers typically have high credit scores. As of December 31, 2019, our customers had, at the time of signing the solar service agreement, an average FICO score of 739. The purpose of our stringent credit approval policy is to ensure reliability of collecting payment over the duration of the solar service agreements. As of December 31, 2019, approximately 0.8% of our customers were in default (over 120 days past due) under their solar service agreements.
>
> Most of our solar service agreements have an initial term of 25 years with an opportunity for customers to renew for up to an additional 10 years via two five-year renewal periods. The customer is obligated to make payments to us on a monthly basis and we operate and maintain the solar energy system and energy storage system, if applicable, in good condition throughout the duration of the agreement. Under our lease agreements and PPAs, the customer's monthly payment or price per kilowatt hour ("hWh") is set based on a calculation that takes into account expected solar energy generation. The customer has an option of choosing a flat rate without an escalator or a lower initial rate with an escalator. As of December 31, 2019, approximately 68% of our lease agreements and PPAs contained a price escalator, ranging from 0.9% to 3.0% annually.
>
> **Our solar service agreements are designed to offer the customer energy cost savings and bill stability relative to centralized utility prices, often resulting in or an immediate reduction in the customer's overall utility bill, with little or no upfront costs.**

34.     Appended to the 2019 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("**SOX**") by the Individual Defendants, attesting that "the information

contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the [Company]."

35.     On that same day, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q4 2019 results (the "**Q4 2019 Earnings Call**"). During the scripted portion of the Q4 2019 Earnings Call, Defendant Berger stated, in relevant part that:

> We closed out the year with another quarter of strong operational and financial results. 2019 was the year Sunnova became the industry leader in growth rate. Throughout the year, we increased our customer base, expanded our dealer network, lowered our cost of capital and boosted our storage attachment rates. As a result, we were able to meet, and is most cases, exceed our 2019 guidance targets.
>
> In Q4 2019 alone, we added 6,000 new customers, which is a 20% increase from what was added just last quarter and an 84% increase over the fourth quarter in 2018. For all of 2019, we grew our customer base at a rate of 30%. We are excited about the year ahead as we continue to acquire customers at a pace that is only continuing to quicken. Due to this increasing growth rate later in the call, we will update the 2020 guidance ranges we discussed in our third quarter 2019 earnings call.

36.     On May 14, 2020, Sunnova issued a press release announcing the Company's Q1 2020 financial results. The press release stated, in relevant part:

> "As a leading residential solar and storage provider in the United States, Sunnova has a deep commitment to providing best-in-class energy service to our customers, in good time and in bad. As the world learns how to navigate the many challenges brought on by the COVID-19 pandemic, we realize that the work we do has become more essential than ever before," said [Defendant ] Berger[.] "Despite these challenges, as a designated essential service provider, we responded quickly and decisively in the early days of COVID-19 to ensure not only the health and safety of our customers, dealers, and employees, but to also ensure our customers continued to receive the highest level of service.["]

37.     On May 15, 2020, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "**Q1 2020 Earnings Call**"). During the scripted

portion of the Q1 2020 Earnings Call, Defendant Berger stated, in relevant part:

> **While I cannot promise what the future will hold, I do know that Sunnova will continue to be a leader to our customers, our dealers, our lenders, our shareholders, and the communities we serve.** And thanks to the ample amount of liquidity we have secured, and the strength and flexibility of our business model, we are better positioned than anyone in the industry to not only get through this current crisis, but to navigate any additional challenges these uncertain times may bring.

38.     On October 28, 2020, Sunnova issued a press release announcing the Company's Q3 2020 results. The press release quoted Defendant Berger stating, in relevant part:

> As weather driven instability of regional power grids becomes increasingly intolerable for consumers and the integration of new technologies behind the meter grows, energy service provides like Sunnova will become even more attractive to homeowners. Driven by these rapid changes in technology, and a growing consumer appetite for cleaner, more reliable, and less expensive energy, **Sunnova is well positioned to become the leading wireless power provider that consumers choose to power their energy independence**.

39.     On February 4, 2021, Sunnova issued a press release announcing the Company's Q4 and full year 2020 results. The press release quoted Defendant Berger stating, in relevant part, "Sunnova is well positions to navigate the current market environment and to lead a decarbonized and decentralized energy transition while providing our customers with better energy service at a better price."

40.     On February 25, 2021, Sunnova filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "**2020 10-K**"). The 2020 10-K contained substantively similar descriptions of the Company's business and customer agreement as discussed above.

41.     Appended to the 2020 10-K as exhibits were signed certifications pursuant to SOX by the Individual Defendants, attesting that "the information contained in the [2020 10-K] fairly

presents, in all material respects, the financial condition and results of operations of the [Company]."

42.     On April 12, 2021, Sunnova published its 2020 Environmental, Social, and Governance Report (the "**2020 ESG Report**"). With respect to strategy, the 2020 ESG Report stated, in relevant part:

> At Sunnova, we believe that sustainability is the foundation of a strong business and a better tomorrow. We seek to inspire positive social change and foster a culture of integrity, performance, and ethical business practices. Beyond the impact of our core business, we focus our attention on areas where we believe we can make the biggest positive environmental impact. We are working to reduce the impact of our operations in order to reduce our carbon footprint and improve efficiency.

43.     Further, with respect to corporate governance, the 2020 ESG Report stated, in relevant part:

> At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices.
>
> Because ESG is a top priority, we formalized its oversight at the Board level through our Nominating and Governance Committee in October 2020. The Committee is responsible for overseeing our ESG approach, strategy, and performance, and has adopted these responsibilities as outlined in our Committee Charter. We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs.
>
> * * *
>
> Our Code of Conduct describes the entrepreneurial spirit on which Sunnova was built and the high standards by which we conduct business. These standards reflect our core values and drive us to achieve our mission. We expect all of our business partners, including our Dealers and Vendors, to follow the laws and regulations where they operate and to share our commitment to ethics, sustainability, environmental stewardship, health and safety, human rights, and labor issues. We conduct our business in a

responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs.

44.    On April 28, 2021, Sunnova issued a press release announcing the Company's Q1

2021 financial results. The press release stated, in relevant part:

> "Sunnova's strong first quarter results and continued rapid growth reiterates the power of our business model and capitalization strategy," said [Defendant] Berger[.] **"Our rapid growth has been made possible through the value of the Sunnova Network, whereby software and services enable aggregation capabilities to create additional value for our customers, dealers and equipment partners.["]**

45.    On April 29, 2021, Sunnova hosted an earnings call with investors and analysts to

discuss the Company's Q1 2021 results (the "**Q1 2021 Earnings Call**"). During the scripted

portion of the Q1 2021 Earnings Call, Defendant Berger stated, in relevant part:

> We are also committed to upholding strong corporate governance practices and conducting business the right way as our core values of service, synergy, and sustainability underpin our corporate culture. We look forward to continuing our work on ESG and will continue to communicate our progress over time.

46.    On July 28, 2021, Sunnova issued a press release announcing the Company's Q2

2021 financial results. The press release stated, in relevant part:

> "The residential solar industry has entered a new phase of maturation and growth and with it a new value proposition for customers has emerged. Where it was once solely focused on the product and savings, the customer value proposition it now acutely focused on reliability and resiliency as well as savings," said [Defendant] Berger[.] "Customers are now expecting a long-term energy service offering that is fast and intelligent. **To meet this need, we have dedicated resources to building out our end-to-end software platform, which contains capabilities such as quoting tools for dealers, predictive service analytics for customers, and grid services software for aggregation.**
>
> "Our field service technicians and customer care team are increasingly providing higher quality services at a quicker pace to

our growing customer base. Service delivery must be quick, accurate, and predictive as new technologies such as batteries, load managers, electric vehicle chargers, and secondary generation enter the market. **Service is becoming the crucial differentiator in the residential energy industry, and Sunnova continues to position itself as the industry leader for wireless power services."**

47.     On July 29, 2021, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q2 2021 results (the "**Q2 2021 Earnings Call**"). During the scripted portion of the Q2 2021 Earnings Call, Defendant Berger stated, in relevant part:

> Our dedicated field service technicians and customer care team are increasingly providing higher quality service at a quicker pace to our growing customer base. The Sunnova-employed service team is focused on delivering unparalleled energy service quickly, accurately, and predicatively as new technologies such as batteries, load managers, electric vehicle chargers, and secondary generation enter the market. Service is becoming the crucial differentiator in the residential energy industry and Sunnova continues to position itself as the industry leader for service.

48.     On October 27, 2021, Sunnova issued a press release announcing the Company's Q3 2021 financial results. The press release stated, in relevant part:

> "At Sunnova, we are committed to providing an unparalleled energy experience to our customers. We see brand and service as the critical differentiators in our industry and we are continuing to develop our technological, operational, and logistical capabilities to improve the quality and response time of the energy service we provide. As more equipment manufacturers enter our rapidly growing industry and broaden their equipment offerings, it has become clear that consumers require a service provider who integrates all of the capabilities and technological advancements into a simple, seamless, and integrated energy system that is backed up with quick and efficient service – and that is who Sunnova is. Our vision is to be a wireless power provider and it is our goal to electrify the home for our customers so that they have the freedom to live life uninterrupted."

49.     On October 28, 2021, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q3 2021 results (the "**Q3 2021 Earnings Call**"). During the scripted

portion of the Q3 2021 Earnings Call, when discussing the Company's "unique and unparalleled service commitment to customers," Defendant Berger stated, in relevant part:

> Launching first in select key markets, we have established a goal well beyond that of any other residential energy service provider. To provide service within 72 hours for our solar-only customers and within 24 hours for our solar plus storage product offering, amounts to a superior energy experience for customers who are frustrated with the increasing cost and decreasing reliability they experience with a monopoly power provider.
>
> We will accomplish this goal by accelerating the build-out of our software platform, continuing to build up our highly experienced and professionally managed service team, and continuously improve our logistics capabilities. This unprecedented service commitment will allow us to provide our customers with the power to live life uninterrupted. In time, it is our goal for the Sunnova name to be synonymous with the best energy service in the world.

50.     On February 23, 2022, Sunnova issued a press release announcing the Company's Q4 and full year 2021 financial results. The press release stated, in relevant part:

> "In 2021, we saw the resiliency of our people, our dealers, our business model, and capitalization strategy help Sunnova navigate economic and regulatory uncertainties. As centralized utilities continue to rapidly increase their rates, Sunnova is able to provide its customers even greater savings through an energy service that is more reliable, more resilient, and more environmentally sustainable."

51.     On February 24, 2022, Sunnova filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "**2021 10-K**"). The 2021 10-K contained substantively similar descriptions of the Company's business and customer agreements as discussed above.

52.     Appended to the 2021 10-K as exhibits were signed certifications pursuant to SOX by the Individual Defendants, attesting that "the information contained in the [2021 10-K] fairly

presents, in all material respects, the financial condition and results of operations of the [Company]."

53.     On April 12, 2022, Sunnova published its 2021 Environmental, Social and Governance Report (the "**2021 ESG Report**"). With respect to corporate governance, the 2021 ESG Report stated, in relevant part:

> At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance and embracing ethical business practices.
>
> This year, with oversight from the Nominating, Corporate Governance and Sustainability Committee, we made great strides in refining our ESG approach, strategy and performance as outlined in our Committee Charter. We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs.
>
> * * *
>
> We seek to empower Sunnova employees to be champions of ESG within their roles and responsibilities. Our vision is to embed ESG throughout the organization through continuous education and engagement.

54.     On April 28, 2022, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q1 2022 results (the "**Q1 2022 Earnings Call**"). During the scripted portion of the Q1 2022 Earnings Call, Defendant Berger stated, in relevant part:

> Earlier in the month, we published our second annual ESG report, detailing the steps we have taken over the last twelve months to enhance our ESG strategy and reporting. Our new report, titled "Charging Ahead", described the impact of the growth we have seen this year and how we are integrating ESG best practices into our core business to drive positive outcomes for our business and society.
>
> Building off our first report last year, our next step was to establish a more formal forward-looking strategy. To start this process, we conducted a materiality assessment to identify the ESG topics that

were most important to our business and to our stakeholders. We engaged our employees, investors, community partners, vendors, and other groups to assess ESG-related topics. From this assessment, we identified nine priority ESG topics for our business, as well as others that we consider material. The results of this assessment can be found in our new report.

55.     On July 27, 2022, Sunnova issued a press release announcing the Company's Q2

2022 financial results. The press release stated, in relevant part:

"High inflation and overall economic distress is further reinforcing the value of the cost savings and predictable nature of the essential energy services Sunnova provides," said [Defendant] Berger[.] "As centralized utilities continue to increase their rates, demand remains strong for our energy services while homeowners seek of offset rising energy costs and increase their energy reliability. **In light of inflationary pressures, consumers are facing tough budgeting choices, but Sunnova will continue to provide a better energy service at a better price to ensure our customers can afford the energy they need to power their lives.**

56.     On October 26, 2022, Sunnova issued a press release announcing the Company's

Q3 financial results. The press release stated, in relevant part:

"In the third quarter, we took action to fortify our liquidity and satisfy our planned 2023 corporate capital needs ahead of schedule through a timely capital raise, putting the company in an excellent financial position with a strong balance sheet," said [Defendant] Berger[.] **"Our record low customer default and delinquency rates and customer feedback clearly show that customers do not see us as merely providing financing by proving an essential service to them.** Sunnova is optimally positioned to benefit from this strong consumer demand for its energy service, catalyzed by a combination of our focus on service, the Inflation Reduction Act, and the global energy crisis, as homeowners look to avoid rising utility bills that they must pay.[""]

57.     On February 23, 2023, Sunnova filed an Annual Report on Form 10-K with the

SEC, reporting the Company's financial and operational results for the quarter and year ended

December 31, 2022 (the "**2022 10-K**"). The 2022 10-K contained substantively similar

descriptions of the Company's business and customer agreements as discussed above.

58.     Appended to the 2022 10-K as exhibits were signed certifications pursuant to SOX by the Individual Defendants, attesting that "the information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the [Company]."

59.     On April 20, 2023, Sunnova issued a press release announcing the DOE's conditional commitment to the LPO loan. The press release stated, in relevant part:

> Sunnova [. . .] today announced a conditional commitment by the [LPO] to provide an up to $3.0 billion partial loan guarantee, which equates to a 90% guarantee of up to $3.3 billion of financing to support loans originated by Sunnova under a new solar loan channel named "Project Hestia."
>
> Project Hestia would provide disadvantaged individuals and communities with increased access to Sunnova services by indirectly and partially guaranteeing the cash flows associated with those consumers' loans. To be eligible, each energy system must be outfitted with Sunnova's purpose-built technology, accessible by smart phone or other personal electronic device. The technology is designed to improve customer insights regarding their power usage and will facilitate demand response behavior. Sunnova believes this approach is expected to expand access to Sunnova's EaaS offerings, lay the foundation for future virtual power plant (VPP) activities, decrease greenhouse gas emissions, and increase the demand response impact of residential power systems.

60.     On April 26, 2023, Sunnova issued a press release announcing the Company's Q1 2023 financial results. The press release stated, in relevant part:

> Our strong growth trajectory can be attributed to our continuous investments in software, service, and multiple channels for growth, which have allowed Sunnova to increase market share and widen its total addressable market. Just last week, we announced a conditional commitment with the [LPO] to expand access to Sunnova's Energy as a Service offerings, potentially adding to our growth by making our energy services accessible to homeowners who may not have qualified without this commitment. We are dedicated to delivering the highest quality service to our customers and to our communities.

61.     On April 27, 2023, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q1 2023 results (the "**Q1 2023 Earnings Call**"). During the scripted portion of the Q1 2023 Earnings Call, Defendant Berger stated, in relevant part:

> The robust demand for our energy services, as described on our previous earnings calls, has persisted throughout the balance of the first quarter and into the month of April. This strong demand can be attributed to our ability to offer customers more affordable energy, higher reliability, and exceptional customer service relative to the centralized power monopolies.
>
> Our commitment to providing a superior energy service sets us apart as industry leaders. We provide responsive and reliable service to our valued customers, utilizing cutting-edge technologies to efficiently manage energy supply and demand through our Sunnova software platform, which powers our seamless Sunnova Adaptive, Home, Sunnova Adaptive Business, and Sunnova Adaptive Community service experiences.

62.     On May 1, 2023, Sunnova published its 2022 Sustainability Report. With respect to the Company's sustainability strategy, the 2022 Sustainability Report stated, in relevant part:

> In keeping with our values of Service, Synergy, and Sustainability, we are committed to continually improving our management of sustainability matters and their impact on our business. Our sustainability strategy serves to complement our corporate objectives, mitigate risks to the business and maximize our impact for our customers, employees, investors, communities, and other stakeholders. We frequently evaluate sustainability risks and opportunities through processes that include materiality assessments, annual risk management evaluations, and regular engagement with stakeholders to ensure we meet their needs.

63.     Further, with respect to the Company's customer service, the 2022 Sustainability Report stated, in relevant part:

> As a leading Energy as a Service (EaaS) provider, we are providing a less expensive, more reliable, and cleaner energy service experience to our customers, ultimately, transforming the way people power their homes and businesses. With our energy services, our customers are achieving greater energy independence,

resilience, and cost savings while reducing their environmental footprint.

It is our unwavering commitment to providing exceptional customer service that helps sets us apart in our industry.

64.     Finally, with respect to corporate governance, the 2022 Sustainability Report stated, in relevant part:

At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices.

As a responsible and sustainable business, we believe that good governance is essential to achieving our long-term goals and creating value for our stakeholders. We are committed to maintaining a high standard of corporate governance, which includes oversight of sustainability issues. Our approach to governance involves a commitment to transparency, accountability, and continuous improvement. We understand that good governance is not just a matter of compliance, but it is also a way of building trust and maintaining strong relationships with our stakeholders.

65.     On July 26, 2023, Sunnova issued a press release announcing the Company's Q2 2023 financial results. The press release stated, in relevant part:

"Our leading Energy as a Service business model, which is supported by three fundamental pillars – scale, service, and the retention of long-term contracted cash flows – has firmly established us as an industry leader quarter over quarter," said Defendant Berger[.] "We are rapidly achieving scale as evidenced by another record number of customers placed into service in the second quarter. This impressive customer growth is a testament to our commitment to providing exceptional service and meeting the needs of our expanding customer base. As a result, we are once again increasing our customer additions guidance by 10,000 customers at the midpoint. We are already in the customer contracting phase for 2024, and, given our strong growth momentum, we are projecting 40% customer growth over 2023."

"We are committed to providing exceptional and timely service. We expect 24-hour service guarantee, currently in four markets and growing to seven by year-end, to reach 70% of our customer base. This unparalleled focus on service further solidifies our position as

> the industry leader in Energy as a Service, and allows our customers to gain access to reliable, affordable, and sustainable energy solutions.["]

66.     On September 28, 2023, Sunnova issued a press release announcing that the Company had entered the LPO Loan. The press release stated, in relevant part:

> Today marks the beginning of an exciting chapter in our pursuit of a cleaner and more equitable energy landscape. With our collaboration with the [DOE], we are embarking on a journey that expands clean energy access and delivers economic benefit to Americans in disadvantaged communities," said [Defendant] Berger[.] "This partnership reflects our commitment to innovation with purpose."

67.     On October 19, 2023, Sunnova issued a press release entitled "Sunnova Prices First Project Hestia Securitization of Residential Solar and Battery Systems." The press release stated, in relevant part:

> Sunnova [. . .] today announced the pricing of its Hestia I securitization, which indirectly benefits from [the LPO Loan].
>
> "Project Hestia stands as a testament to Sunnova and the DOE's unwavering commitment to spearheading transformative initiatives that benefit customers, empower communities, and enhance the overall energy landscape in the United States," said [Defendant] Berger[.] "This successful pricing of Project Hestia's first securitization showcases our continuing dedication to pioneering sustainable, reliable, and cost-effective energy solutions."

68.     The statements above made by the Individual Defendants were materially false and misleading, and they failed to disclose materially adverse facts about the Company's business, operations, and compliance policies. Specifically, the Individual Defendants made false and misleading statements and failed to disclose that: (i) Sunnova routinely engaged in predatory business practices against disadvantaged homeowners and communities, the same groups that Project Hestia was purportedly intended to benefit; (ii) the forgoing conduct subjected the Company to a heightened risk of regulatory and governmental scrutiny, as well as significant

25

reputational and/or financial harm; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

69.    On November 22, 2023, the *Washington Free Beacon* published an article entitled "Biden Admin Gave $3 Billion to Solar Company Accused of Scamming Elderly." The article stated, in relevant part:

> A solar company that was awarded a $3 billion Department of Energy loan has been accused of scamming dementia patients on their deathbeds into signing five-figure multi-decade solar panel leases, according to interviews and state consumer complaint records obtained by the *Washington Free Beacon*.
>
> Terry Blythe, a Texas resident, told the *Washington Free Beacon* that her father was 86 years old and had been diagnosed with dementia when a door-to-door Sunnova salesman persuaded him to sign a 25-year solar panel lease in 2020. When her father passed away earlier this year, Blythe said she was left to grapple with the $34,000 contract.
>
> * * *
>
> Blythe's is one of over 50 consumer complaints that have been filed against Sunnova with the Texas attorney general's office since last year, for issues ranging from maintenance delays to allegedly predatory sales tactics.
>
> * * *
>
> Sen. John Barrasso (R., Wyo.), the top Republican on the Senate Energy and Natural Resources Committee, and other lawmakers have been investigating potential conflicts of interest at the DOE's Loan Programs Office (LPO), including its funding to Sunnova.
>
> Before LPO director Jigar Shah joined the Biden administration, he founded and led a trade association called Cleantech Leaders Roundtable, which shares a board member with Sunnova. Cleantech Leaders Roundtable has become a gatekeeper for companies seeking loans from Shah's office, cohosting paid events for its members with the LPO director, the Free Beacon reported in October.

"The potential for conflicts of interest, especially in light of a $3 billion loan approval for Sunnova, a company who shares a board member with Cleantech Leaders Roundtable, cannot be overlooked," said Barrasso in a letter to DOE's ethics counsel Susan Beard this month.

70.     Then, on December 8, 2023, House Energy Committee Chair Rodgers and Senate Energy Committee ranking member Barrasso sent a letter to the DOE and Sunnova seeking information related to the LPO Loan following the release of the reports regarding the Company's business practices. The letter stated, in relevant part:

We write to you regarding disturbing reports about Sunnova Energy Corporation (Sunnova), a residential solar company, to which the Department of Energy's (DOE) Loan Programs Office (LPO) recently awarded a $3 billion partial loan guarantee.

Billed as "the single largest commitment ever made by the Federal Government to solar power," LPO closed this partial loan guarantee to Sunnova's "Project Hestia" on September 28, 2023.[] According to LPO, this project will make distributed energy resources and virtual power plant software available to more Americans by providing loans to approximately 75,000 to 115,000 homeowners for clean energy systems.[] This project will focus on households in disadvantaged communities, aiming to provide at least 20 percent of loans to customers with FICO credit scores of 680 or less and up to 20 percent of loans to homeowners in Puerto Rico.

We are alarmed about recent, credible reports that Sunnova has racked up numerous consumer complaints, including those alleging troubling sales practices, such as Sunnova pressing elderly homeowners in poor health to sign long-term contracts costing tens of thousands of dollars.[] These reports cite interviews with individuals who struggled to deal with large contracts that their elderly parents signed shortly before passing away as well as state consumer complaints alleging maintenance delays and predatory sales strategies.[] For example, one woman interviewed stated that a door-to-door Sunnova salesman sold her father – who she characterized as in hospice care – a $60,000 solar system for his mobile home shortly before his death.

Additional reports suggest these troubling reports are not isolated incidents. For example, while Project Hestia will target Puerto Rican homeowners for 20 percent of its loans, its residents have previously

27

experienced major problems with Sunnova's services there. By 2017, Puerto Rico's Independent Officer of Consumer Protection reportedly received over 1,000 complaints regarding Sunnova systems that include claims of misleading consumers and failing to deliver lower energy bills as promised.[] In 2019, the Puerto Rican Energy Bureau also release a report confirming the validity of numerous consumer complaints it received. These included complaints of consumers accidentally signing up for 25-year contracts, consumers being misled about potential savings with solar panels, and Sunnova not fully revealing the costs of financing these solar panels to consumers.[] Residents in other parts of the country have also reported problems with Sunnova systems, including deceptive sales practices.[] These allegations are particularly troubling, as LPO has stated this program will focus on disadvantaged communities.

71.     The reality is that Sunnova exploited the customers it claimed were critical to its business.  Instead of operating a legitimate business focused on delivering solar alternatives to people who benefit the most from affordable energy alternatives, the Company exploited the opportunity to make a profit.  For instance, customers reported delays in receiving responses to their inquiries and issues concerning service and billing.  The Company's support is inadequate with customers feeling that their problems were not resolved promptly. Installation delays extend for months beyond the expected completion date. Customers have reported that their solar systems did not perform as expected, leading to lower energy production and savings than promised.

72.     Equally disturbing is that customers have sometimes found Sunnova's contracts to be complex and difficult to understand, leading to confusion about terms and conditions. There have been numerous reports of billing inaccuracies and difficulties in resolving billing disputes, causing financial stress for customers.

73.     Maintenance and Repairs are often delayed affecting the overall performance and reliability of the systems.  Moreover, the quality of the repairs is suspect.

74.     Most disturbing is that the Company employs aggressive sales tactics including high-pressure sales techniques and promises that were not always fully transparent or accurate.

75.     Accordingly, Defendants operated an illegal and regulatorily noncompliant business model that was unsustainable, detrimental to the Company and public, and in violation of myriad fiduciary duties.

76.     Once the market was apprised of the forgoing, Sunnova's stock price fell 16.12%, or $2.00 per share, to close at $10.41 per share on December 8, 2023.  The Company now trades below $6 per share.

### The Company's Fiduciaries Sold Over $1 Billion of Sunnova Stock at Artificially Inflated Prices While in Possession of MNPI

77.     Meanwhile, prior to the truth being revealed to the market, certain Individual Defendants dumped over $1 billion worth of their personal holdings of Sunnova stock at artificially inflated prices. By virtue of their high-level positions as officers and directors of the Company, defendants Berger, D'Argenio, Kimmelman, Morgan, Longstreth, and Shaper (the **"Insider Selling Defendants"**) possessed MNPI, which they knew was not yet disclosed to the public, namely that Sunnova intentionally engaged in predatory business practices against disadvantaged homeowners and communities, the same groups that Project Hestia was purportedly intended to benefit. This subjected the Company to a heightened risk of regulatory and governmental scrutiny, as well as significant reputational and/or financial harm. The Insider Selling Defendants nevertheless acted to exploit their knowledge of this MNPI by selling over $1 billion in Sunnova stock to their benefit and to the detriment of the Company and its public stockholders before the truth emerged on December 8, 2023.

78.     Defendant Berger made the following sale of Sunnova stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $10.41 per Share | Losses Avoided |
|------|-------------|----------------------|----------|---------------------------|----------------|
| 8/8/2022 | 150,000 | $30.04 | $4,506,000.00 | $1,561,500.00 | $2,944,500.00 |
| | | Totals: | $4,506,000.00 | | $2,944,500.00 |

79.     This sale amounts to over **seven** times his $620,833 salary and approximately 0.75 times his total compensation from the Company for the 2023 fiscal year. By selling his stock before the MNPI was disclosed to the public, Berger avoided losses of nearly $3 million. He has neither sold any Sunnova stock since the Relevant Period nor before the Relevant Period.

80.     Defendant D'Argenio, through his affiliation with Energy Capital Partners, made the following sales of Sunnova stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $10.41 per Share | Losses Avoided |
|------|-------------|----------------------|----------|---------------------------|----------------|
| 7/6/20 | 6,211,533 | $15.76 | $97,893,760.08 | $64,662,058.53 | $33,231,701.55 |
| 8/18/20 | 7,229,760 | $24.13 | $174,454,108.80 | $75,261,801.50 | $99,192,307.20 |
| 10/2/20 | 5,000,000 | $28.00 | $140,000,000.00 | $52,050,000.00 | $87,950,000.00 |
| 12/15/20 | 3,000,000 | $40.80 | $122,400,000.00 | $31,230,000.00 | $91,170,000.00 |
| 11/1/21 | 6,000,000 | $41.28 | $247,680,000.00 | $62,460,000.00 | $185,220,000.00 |
| | | Totals: | $782,427,868.88 | | $496,764,008.75 |

81.     By selling his stock before the MNPI was disclosed to the public, D'Argenio avoided losses of almost $496.8 million. Neither Defendant D'Argenio, nor Energy Capital Partners have sold any Sunnova stock since the Relevant Period nor before the Relevant Period.

82.     Defendant Kimmelman, through his affiliation with Energy Capital Partners, made the following sales of Sunnova stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $10.41 per Share | Losses Avoided |
|------|-------------|----------------------|----------|---------------------------|----------------|
| 7/6/20 | 6,211,533 | $15.76 | $97,893,760.08 | $64,662,058.53 | $33,231,701.55 |

| | | | | | |
|---|---|---|---|---|---|
| 8/18/20 | 7,229,760 | $24.13 | $174,454,108.80 | $75,261,801.50 | $99,192,307.20 |
| 10/2/20 | 5,000,000 | $28.00 | $140,000,000.00 | $52,050,000.00 | $87,950,000.00 |
| 12/15/20 | 3,000,000 | $40.80 | $122,400,000.00 | $31,230,000.00 | $91,170,000.00 |
| 11/1/21 | 6,000,000 | $41.28 | $247,680,000.00 | $62,460,000.00 | $185,220,000.00 |
| | | Totals: | **$782,427,868.88** | | **$496,764,008.75** |

83.     By selling his stock before the MNPI was disclosed to the public, Kimmelman avoided losses of nearly $496.8 million. Neither Defendant Kimmelman, nor Energy Capital Partners have sold any Sunnova stock since the Relevant Period nor before the Relevant Period.

84.     Defendant Longstreth, through his affiliation with Newlight Partners LP, made the following sales of Sunnova stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $10.41 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 8/4/20 | 2,100,000 | $25.25 | $53,025,000.00 | $21,861,000.00 | $31,164,000.00 |
| 12/1/20 | 4,025,000 | $37.00 | $148,925,000.00 | $41,900,250.00 | $107,024,750.00 |
| | | Totals: | **$201,950,000.00** | | **$138,188,750.00** |

85.     By selling his stock before the MNPI was disclosed to the public, Longstreth avoided losses of nearly $138.2 million. Neither Defendant Longstreth, nor Newlight Partners LP, have sold any Sunnova stock since the Relevant Period nor before the Relevant Period.

86.     Defendant Morgan made the following sales of Sunnova stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $10.41 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 12/7/20 | 69,800 | $38.33 | $2,675,434.00 | $726,618.00 | $1,948,816.00 |
| 12/7/20 | 5,200 | $39.33 | $204,516.00 | $54,132.00 | $150,384.00 |
| 12/7/20 | 23,100 | $38.32 | $885,192.00 | $240,471.00 | $644,721.00 |
| 12/7/20 | 1,900 | $39.30 | $75,670.00 | $19,779.00 | $54,891.00 |
| 10/20/21 | 1,868 | $40.32 | $75,317.76 | $19,445.88 | $55,871.88 |
| 10/20/21 | 27,900 | $40.80 | $1,138,320.00 | $290,439.00 | $847,881.00 |
| 10/20/21 | 2,100 | $41.31 | $86,751.00 | $21,861.00 | $64,890.00 |
| 10/28/21 | 30,000 | $44.33 | $1,329,900.00 | $312,300.00 | $1,017,600.00 |
| | | Totals: | **$6,470,100.76** | | **$4,785,054.88** |

87.     These sales amount to over **97** times his $66,411 in fees and over **34** times his total compensation from the Company for the 2023 fiscal year. The trades made by Defendant Morgan on December 7, 2020 were conducted pursuant to a 10b5-1 trading plan adopted on November 5, 2020, during the Relevant Period. The trades made by Defendant Morgan from October 20, 2021, to October 28, 2021 were conducted pursuant to a 10b5-1 trading plan adopted on September 20, 2021, during the Relevant Period. By selling his stock before the MNPI was disclosed to the public, Morgan avoided losses of nearly $4.8 million. He has neither sold any Sunnova stock since the Relevant Period nor before the Relevant Period.

88.     Defendant Shaper made the following sales of Sunnova stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $10.41 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 9/23/20 | 49,273 | $25.96 | $1,279,127.08 | $512,931.93 | $766,195.15 |
| 9/23/20 | 22,441 | $26.55 | $595,808.55 | $233,610.81 | $362,197.74 |
| 9/24/20 | 64,514 | $25.61 | $1,652,203.54 | $671,590.74 | $980,612.80 |
| 9/24/20 | 9,933 | $26.11 | $259,350.63 | $103,402.53 | $155,948.10 |
| 9/25/20 | 9,631 | $25.99 | $250,309.69 | $100,258.71 | $150,050.98 |
| 9/25/20 | 44,208 | $26.38 | $1,166,207.04 | $460,205.28 | $706,001.76 |
| 9/28/20 | 70,839 | $27.37 | $1,938,863.43 | $737,433.99 | $1,201,429.44 |
| 9/28/20 | 11,444 | $28.08 | $321,347.52 | $119,132.04 | $202,215.48 |
| 9/30/20 | 34,539 | $28.13 | $971,582.07 | $359,550.99 | $612,031.08 |
| 9/30/20 | 24,711 | $29.15 | $720,325.65 | $257,241.51 | $463,084.14 |
| 9/30/20 | 158,467 | $30.03 | $4,758,764.01 | $1,649,641.47 | $3,109,122.54 |
| | | **Totals:** | **$13,913,889.21** | | **$8,708,889.21** |

89.     These sales amount to over **175** times his $74,456 in fees and over **69** times his total compensation from the Company for the 2023 fiscal year. The trades made by Defendant Shaper from September 23, 2020 to September 30, 2020 were conducted pursuant to a 105-1 trading plan adopted on August 24, 2020. By selling his stock before the MNPI was disclosed to the public,

Shaper avoided losses of nearly $8.7 million. He has neither sold any Sunnova stock since the Relevant Period nor before the Relevant Period.

90.     Once the market was apprised of the forgoing facts regarding the Company's predatory business practices, Sunnova's stock price fell 16.12%, or $2.00 per share, to close at $10.41 per share on December 8, 2023. This is far below the price at which the Insider Selling Defendants had sold their own Sunnova shares during the Relevant Period. The Company now trades below $6 per share.

91.     As a result of the wrongful conduct alleged herein, the Company suffered significant damage.

## FIDUCIARY DUTIES

92.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Sunnova and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Sunnova in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Sunnova and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

93.     Each Individual Defendant owes and continues to owe Sunnova, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

94.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sunnova, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Sunnova, each of the Individual Defendants had knowledge of material, nonpublic

information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

95.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States and pursuant to Sunnova's own Code of Conduct;

(c)     Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)     Remain informed as to how Sunnova conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Sunnova, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)    Maintain and implement an adequately functioning system of internal legal, financial, and management controls such that Sunnova's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)    Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

96.    The Individual Defendants, because of their advisory, executive, managerial and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein and the content of the various public statements issued by Sunnova.

97.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Sunnova and were at all times acting within the course and scope of such agency.

**Duties Pursuant to the Company's Code of Conduct**

98.     The Individual Defendants, as officers and/or directors of Sunnova, were bound by

Sunnova's Code of Conduct[2] (the "**Code of Conduct**") which provides:

> Our mission as a company is to Power Energy Independence™, and we achieve this mission when we conduct ourselves ethically, respectfully and honestly. The Sunnova Code of Conduct describes the very foundation by which we go about our business each and every day and the driving entrepreneurial spirit upon this company was built.
>
> We must meet the highest expectations of our customers, shareholders, employees and the communities we serve; I am personally committed to making sure we embody the strong ethical principles captured in this key document. Together, we need to demonstrate inclusive, respectful, honest and ethical behavior when we interact with each other, our customers and the public.
>
> By upholding our Code of Conduct, you will help ensure that we achieve the right results in the right way. I believe that by living these standards, we will continue to pioneer best practices in the solar energy industry. Thank you for being engaged and committed to making the principles and practices of our Code of Business Conduct part of your daily work.

99.     A section of the Code of Conduct titled "Purpose of Our Code" states the following:

> The purpose of our Code of Conduct (our "Code") is to convey the principles of ethical business conduct expected of all our employees and those who represent Sunnova Energy International Inc., and its subsidiaries (the "Company"). The reputation and success of the Company depend on the way we conduct our business and the way we are perceived by the public and regulators. Our Code emphasizes the application of certain values that will help us keep our commitment to conduct our affairs with integrity and the highest legal and ethical standards.
>
> The Company, its employees, and all parties with whom it transacts business are expected to comply with all laws, rules, and regulations applicable to the Company's activities. Employees are trained

---

[2] *See* Sunnova Energy International, Inc.'s Code of Conduct (July 2023): https://s23.q4cdn.com/546214306/files/doc_downloads/governance/2023/08/GC-POL-0001-Code-of-Conduct-July-2023.pdf.

annually on the Code and are held accountable to follow the letter as well as the spirit of our Code. Employees are also responsible for being familiar with and complying with all company policies. Unethical actions or the appearance of unethical actions are not acceptable and will not be tolerated. The Company is committed to conducting investigations of alleged violations of the Code and taking appropriate corrective action where violations are found to have occurred.

100. Under the "Purpose of Our Code" section of the Code of Conduct, a subsection titled "Reporting Violations" states: "Employees have a responsibility to report any conduct that appears to be unethical or illegal or that appears to violate our Code, our other policies or applicable laws and regulations." Under the "Purpose of Our Code" section of the Code of Conduct, a subsection titled "Reporting Violations" states the following:

The Company will promptly and thoroughly investigate all reports of Code violations, violations of other Sunnova policies, and/or violations of applicable laws made in good faith. General Counsel will review all complaints and may delegate investigation of the issue to an investigator who is objective and not personally involved in the facts under investigation. At the direction of the General Counsel, investigations may be led by the Company's Legal Department, Human Resources, or an outside investigator as deemed appropriate. Investigations will be conducted confidentially to the greatest extent possible.

Actions taken as part of an investigation may include (but not be limited to) the following:

• documenting the concern in order to initiate an investigation
• gathering data and interviewing appropriate parties to determine the facts of the situation
• working to resolve the issue through appropriate channels
• taking appropriate corrective action
• relaying the information to the appropriate people/authorities
• monitoring for future occurrences

101. Under the "Purpose of Our Code" section of the Code of Conduct, a subsection titled "No Retaliation" states the following:

The Company strictly prohibits retaliation, in any form, against anyone who makes a good faith report of violations or suspected violations of our Code, Company policies or applicable law, or who assists in the investigation of a reported violation. Anyone who believes that they have been the subject of retaliation or who is aware of any such conduct by a Company employee, contractor or dealer shall immediately report such acts to the Company's General Counsel, Human Resources, or through the Hotline. Any employee found to have retaliated against another employee in violation of our Code is subject to discipline, including, but not limited to, termination.

102. A section of the Code of Conduct titled "We Protect Our Company Assets" states: "Corporate assets include employee time, equipment, office supplies, fuel, financial resources, computers and systems, vendor and partner information, employee information, internet usage, or business information the Company acquires or produces."

103. Under the "We Protect Our Company Assets" section of the Code of Conduct, a subsection titled "Use of Assets" states the following:

We provide assets and information to our team for use in Company business only. We must actively and vigilantly protect all Company assets from theft, loss, abuse, simple waste, and harm. Our property includes confidential or proprietary information, software, computers, office equipment and supplies. Each employee has the duty and responsibility to guard against unauthorized use or disclosure of Company assets or information. This includes the responsibility to keep such information (such as on your computer) locked when unattended. Employees may not use, download, copy, or transfer the Company's proprietary business information for their personal benefit.

104. Under the "We Protect Our Company Assets" section of the Code of Conduct, a subsection titled "Computer, Internet, Email and Social Media" states the following:

Employees may use Company systems and equipment for very limited personal use and are advised that they have no expectation of privacy while using the Company's computers, internet, hardware, software, and electronic systems. Further, employees are advised that the Company actively monitors its systems for inappropriate employee use. All data stored on Company computers,

38

phones or other electronic devices (including personal devices where Company-related data is concerned), including email and text messages/IM's, is Company property and is not private, except as required by law.

Sharing confidential material, trade secrets, or proprietary information outside the Company, or copying or removing these materials from the Company's secure system is strictly prohibited, unless an employee has written authorization. As described later in our Code, all employees are responsible for protecting the Company's information and system.

Even if employees limit their personal use of the Company's system, at no time may employees use Company resources for anything that is considered inappropriate under our Code or our policies. The Company strictly prohibits sending or viewing pornography, gore, discriminatory humor, degrading imagery, workplace inappropriate material, or other material which could be considered discriminatory, harassing, or offensive to our colleagues.

You may never sign on to any network equipment using the password or username of another employee. No employees should access, attempt to access, alter, or delete any network document except in furtherance of authorized Company business.

No employee may make a disclosure of confidential or material inside information to anyone outside of the Company and in a manner to broadly disseminate such information to the public without authorization, including, but not limited to, emails, posts on blogs, message boards, chat rooms, and other social media sites. The Company does, however, encourage employees to post positive news about the Company on employees' social media accounts (so long as there is no attempt to post on behalf of the Company, and the news and related posting is truthful), but must do so in accordance with the Code, other Company policies for all such activities, and any applicable instructions from the Company. Employees should use integrity and respect in postings, avoiding any disparaging, harassing, or offensive language and may not post any unauthorized images, videos, or recordings of Company facilities or operations – including use of the Company logo. Employees whose social media accounts contain offensive content should avoid posting about the Company. Additionally, employees should not use Company email addresses for personal social media profiles or postings.

Finally, employees should be alert to unwittingly revealing confidential information to third parties by using third-party applications and websites including generative artificial intelligence services. These third-party services pose a risk of retaining information that is part of a prompt or query and later revealing company confidential information to third parties.

105.    Under the "We Protect Our Company Assets" section of the Code of Conduct, a

subsection titled "Respect for Intellectual Property" states the following:

Employees must protect and responsibly use Sunnova Energy Corporation trademarks, copyrights, trade secrets and other intellectual property.

In no case may employees download or use information in any way that violates patent, trademark, copyright, trade secret, or other intellectual property rights of others, nor may you use Company resources for any illegal activity of any kind. To the extent that you receive authorization to use intellectual property of others, you must responsibly use such intellectual property, including compliance with all applicable licenses and terms of use.

Employees should also be alert to the risk of violating the intellectual property rights of third parties through the use of generative artificial intelligence tools that may have been trained on copyrighted or protected content without permission.

106.    Under the "We Protect Our Company Assets" section of the Code of Conduct, a

subsection titled "Confidential and Proprietary Information" states the following:

Employees must maintain the confidentiality of information entrusted to them by the Company and must take all reasonable steps to protect confidential and proprietary information. This includes nonpublic information that is received by or created by employees in the course of their work, except when disclosure is authorized by the Company or legally mandated.

Confidential and proprietary information includes, but is not limited to:

• All forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure,

40

financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

• Communications that are privileged for any reason, including information that is subject to the attorney-client privilege or protected by the work-product doctrine. If you are unsure whether information falls into this category, ask the legal department.

• To the extent you have joined Sunnova from a former employer, the definitions of "confidential and proprietary information" in this section apply to information obtained from a former employer. Use of a former employer's confidential and proprietary information is prohibited and is considered a violation of this Code.

107.    Under the "We Protect Our Company Assets" section of the Code of Conduct, a subsection titled "Business Opportunities" states the following:

Employees may not take advantage of information or knowledge that they gain due to employment with the Company or divert to others any business or other opportunity in which they should reasonably anticipate the Company might be interested. Each employee is responsible for making the Company aware of any potential business opportunities of which he or she becomes aware. You are prohibited from using the Company's property, information or your position for personal gain or in competition with the Company.

108.    Under the "We Avoid Conflicts of Interest" section of the Code of Conduct, a subsection titled "Business Opportunities" states the following:

A conflict of interest occurs when the private interests of an employee and his/her responsibilities as an employee of the Company are in conflict. As an employee, you have an obligation/duty to act in the Company's best interests at all times. Employees must ensure they do not place themselves in a position that could have the appearance of being, or be construed to be, in conflict with the interests of the Company.

Conflicts of interest may arise where the employee has a financial or other personal interest that might interfere with his or her objectivity in performing Company duties and responsibilities.

Examples include working with or supervising relatives, ownership interests in partners, vendors or competitors, accepting excessive gifts or entertainment from vendors or partners or taking personal advantage of the Company's business opportunities. Details are provided in the Conflicts of Interest Policy. Employees must immediately disclose any conflict or potential conflict of interest to the Legal Department or Human Resources and abide by the Company's direction regarding such conflict or potential conflict. If there is any doubt regarding a potential conflict, employees should err on the side of disclosure.

109.   Under the "We Use Resources Properly" section of the Code of Conduct, a subsection titled "Vendor Relationships" states the following:

Vendors must be selected based on the merit of their price, quality, and service. Employees must not choose any vendor based on a personal relationship or private dealings with the vendor. In no case should an employee serve as the decision-maker in a vendor selection process in which he or she or a relative has a financial interest or relationship in a potential vendor. Any employee with a personal financial interest or a close family relative who is an owner or employee of a vendor must disclose such relationship to the General Counsel if it exists.

110.   Under the "We Use Resources Properly" section of the Code of Conduct, a subsection titled "Professional Relationships" states the following:

We avoid favoritism and the appearance of favoritism. While employees and supervisors may socialize outside of work from time to time, supervisors must take special care that they do not exclude anyone on their team from the opportunity to enhance and strengthen the working relationship through social interaction in appropriate venues. Thus, leaders should not have personal relationships with any employees or contract personnel that go beyond the level of relationship they would have with all employees on their teams. Likewise, employees who are not leaders but handle sensitive or confidential Company information must also follow the standards expected of the leaders of the Company. Dating, romantic, or sexual relationships, even if consensual, between a supervisor and an employee who are in a reporting relationship are prohibited. Further, any dating, romantic, or sexual relationships, even if consensual, between any employee and any supervised contract personnel are prohibited.

42

111.    Under the "We Respect Records Retention, Disclosures, and Data Privacy" section of the Code of Conduct, a subsection titled "Accuracy" states the following:

> The Company is committed to the accurate management and retention of its business records to properly manage decisions and to fulfill the Company's financial, legal, and reporting obligations. All of the Company's records must be complete, timely, accurate and reliable in all material respects. All transactions must be properly documented and accounted for on the books and records of the Company, and no off-book funds or transactions are permitted.
>
> When required to report data externally, the data must be verified internally as accurate before submitting. No tolerance is allowed for falsifying or not verifying regulatory, tax, or other compliance data.
>
> All reports, vouchers, bills, invoices, payroll, business measurement and performance records, and other essential data must be prepared and maintained with care and honesty. No such data may be falsified or altered to conceal or distort assets, liabilities, revenues, expenses, or performance results.

112.    Under the "We Respect Records Retention, Disclosures, and Data Privacy" section of the Code of Conduct, a subsection titled "Record Retention" states the following:

> All documents must be maintained and destroyed in accordance with our Records Retention Policy. Records relevant or related to an ongoing or anticipated legal proceeding, government investigation, legal hold, or audit must not be destroyed, even if scheduled for destruction, until the legal department advises such destruction is permissible.
>
> Employees are responsible for safeguarding the Company's assets, data, and properties under their control and for providing auditable records. Therefore, records should be managed based on appropriate records retention schedules set forth in the Records Retention Policy and only be destroyed in accordance with the applicable retention schedule.
>
> All correspondence and business communications on behalf of the Company must be conducted on Company email or other Company-administered communications platforms where automated records retention practices may be applied. Employees may not conduct company business via third party messaging applications such as WhatsApp, Signal or other means not accessible to the Company.

43

Employees are required to not destroy and to provide to Company representatives upon request any personal mobile phone or other device used to access Company systems and/or conduct business on behalf of the Company.

113.   Under the "We Respect Records Retention, Disclosures, and Data Privacy" section

of the Code of Conduct, a subsection titled "Data Privacy and Security" states the following:

The Company is committed to complying with all applicable laws regarding the collection, protection, and dissemination of personal identification information collected from employees, customers, and third parties. The Company limits the personal information it requires employees and customers to provide to that which is necessary for the Company to conduct business in an effective manner.

Access to personal employee information, including medical records, is strictly limited by our policies and governmental privacy laws and regulations. To further protect privacy, employees are prohibited from accessing personal data unless authorized in advance and there is a "need to know" because of their position or responsibility. Employees are expected to follow all internal controls outlined by the Company for the review, collection, storage, and dissemination of personal information, both their own information as well as that of others.

Sunnova has a responsibility to protect its customers' privacy and their confidential information, and access to this information is strictly limited to those employees who need it in order to conduct Sunnova business.

While we respect employees' privacy, we reserve the right to inspect our offices and property, including computers, telephone records, emails, text messages, files, business documents and workplaces. Employees have no right to privacy when using services or equipment provided by the Company or while on Company premises.

114.   Under the "We Follow the Laws and Our Policies" section of the Code of Conduct,

a subsection titled "Legal and Regulatory Compliance" states the following:

All officers and employees must seek to comply with all applicable laws and regulations. All employees, officers, and representatives of

the Company are expected to consult with internal subject matter experts on compliance questions and to consult with the Company's legal department where appropriate concerning such matters.

115.    Under the "We Follow the Laws and Our Policies" section of the Code of Conduct, a subsection titled "Insider Trading" states the following:

> It is a violation of law to pass material non-public information, commonly referred to as "inside information," on to others or to buy or sell securities to take advantage of inside information. Trading in securities of the Company, including within any 401(k) plan or IRA or other entity, tipping others who may engage in such trading while the employee has material non-public information about the Company or other entity, and other inappropriate uses of the Company's nonpublic information violates our Code and is illegal. Such trading may result in civil penalties of up to three times the profit made or loss avoided on the trade, and/or criminal penalties including fines and imprisonment, and is also a violation of our Code.

116.    Under the "We Follow the Laws and Our Policies" section of the Code of Conduct, a subsection titled "Anti-Corruption and Anti-Bribery" states the following:

> We prohibit any form of corruption whether of public officials and government employees or commercial bribery of customers, dealers or vendors. This means that any unauthorized payments or acts that create even the appearance of offering, promising or the payment of anything of value, intended to influence any governmental official, political party, or any other person, including, but not limited to, customers, dealers or vendors, for the purpose of influencing any act or decision in order to obtain or retain business or a business advantage, including beneficial treatment for any business purpose, is prohibited.

> Both the law and the Company also prohibit any improper payments that are made indirectly such as through a third party. This means that employees may not authorize, explicitly or implicitly, the offer or payment of any money, or any other thing of value, by any agent, vendor, business partner or other third party to any government official or employee or to any other recipient for the purpose of improperly influencing any decision or action or securing any advantage.

> Further, as with all of the Company's other business, in conducting business with the federal, state, or any local government, the Company will endeavor to ensure that all requests for payment are lawful and that the information supporting the request is truthful.

117.     Under the "We Follow the Laws and Our Policies" section of the Code of Conduct,

a subsection titled "Antitrust/Competition Law" states the following:

> Any commercial transaction with a competitor, government, or vendor should be done on an arm's length basis. Collusion on terms or price are not allowed; therefore, employees must not share any competitive information with competitors, suppliers, and vendors. The antitrust laws also prohibit any agreement among competitors to set, raise, fix, stabilize or otherwise affect price; therefore, Company employees should not discuss prices, credit terms, discounts or warranties with competitors. In addition, the antitrust laws prohibit any understanding or agreement between competitors to divide customers, territories or otherwise. Likewise, no Company employee should agree with an employee of a competitor or any other company to "boycott" or refuse to deal with a third party. These antitrust considerations may arise during discussions at association or industry gatherings. If any competitor or other third party communicates in any way (and in any tone or context) that some cooperation or agreement among competitors should be considered or appropriate, it must be immediately reported to the General Counsel. To ensure compliance with antitrust laws, please see the legal department for additional guidance on appropriate conduct before such an event.

118.     Under the "We Follow the Laws and Our Policies" section of the Code of Conduct,

a subsection titled "Political Involvement Activity, and Contributions" states the following:

> It may be in the Company's fully appropriate to protect and enhance long-term stockholder value to use Company's resources to make political contributions targeted to ethically and constructively promote legislative and regulatory actions that further the Company's business objectives. All political contributions will be made in a manner consistent with U.S. federal, state, territorial and local laws and in accordance with this Code, our Anti-Corruption Policy and our Corporate and Political Contributions Policy. Employees are encouraged to participate, as private citizens, in the political process and/or make campaign contributions as private citizens but may not make political donations on the Company's behalf. The Company may also make its position known, within

lawful limitations, on issues affecting the industry, the Company, stockholders, and the communities in which the Company operates.

Employees may not provide gifts or entertainment to government officials while acting as an employee of the Company, including (1) House of Representative or Senate members and their staffs and immediate family members; (2) Executive Branch political appointees, their family members, and other designees specified by the appointee; (3) members of the federal or state judiciary; (4) a federal agency, active military, and state and local government personnel; and (5) candidates for political office.

No direct or indirect use of Company funds shall be used for any illegal political purpose, no matter how small the amount and regardless of whether the payment is thought necessary to promote a legitimate activity of the Company. To ensure appropriateness, any use of company assets for political reasons must be approved by the CEO, the EVP, Policy and Communications, and the General Counsel.

119. Under the "We Follow the Laws and Our Policies" section of the Code of Conduct, a subsection titled "Obstruction of Justice" states the following:

Employees may not testify falsely under oath or obstruct justice by refusing to testify, making false statements (for example, in interviews or in responding to subpoenas or interrogatories) or destroying, altering or falsifying documents or evidence related to legal proceedings (for example, in litigation and regulatory hearings) and government investigations.

120. Under the "We Follow the Laws and Our Policies" section of the Code of Conduct, a subsection titled "Cooperation with Audits and Investigations" states the following:

Employees are required to cooperate with all Company investigations and audits, which may include participating in interviews, providing documents or information, producing the employee's phone or computer, and providing testimony as reasonably requested. All information requested in an audit or investigation, whether by our internal audit staff, legal staff or by outside counsel or investigators, including governmental investigators, must be provided promptly.

121. A section titled "We Take Our Responsibilities Seriously" in the Code of Conduct states: "Employees must hold themselves to the highest ethical and legal standards and must immediately report any situation that is, or that may be, in conflict with out Code whether or not the employee is directly involved in the situation. If it is determined that an employee was aware or should have been aware of inappropriate behavior but did not report it, that employee may be subject to disciplinary action, up to and including termination."

122. Under the "Enforcement and Waivers" section of the Code of Conduct, a subsection titled "No Retaliation" states the following:

> In the event you are approached by the Company regarding an investigation that the Company has determined should be kept confidential, you should fully cooperate and keep your knowledge of the investigation confidential. Failure to report a suspected violation or to cooperate, provide truthful answers, or maintain confidentiality when asked regarding an investigation will be a violation of our Code.

> The Company will not tolerate retaliation for reporting potential violations of our Code which are made in good faith, or for cooperating with an investigation of possible misconduct. Likewise, the Company will not tolerate claims that are not made in good faith but are made for the purpose of misleading, harming, disparaging, or otherwise demoralizing, employees, leaders, or the Company.

123. Under the "Enforcement and Waivers" section of the Code of Conduct, a subsection titled "Enforcement Approach" states the following:

> We take our Code very seriously, and the Company will take appropriate steps to investigate all reports regarding possible non-compliance. Any employee who violates our Code, other policies, standards and procedures or the law, or knowingly permits a subordinate to do so, will be subject to disciplinary action up to and including termination, and may be subject to civil prosecution or claims for damages or losses in certain circumstances.

124. Under the "Enforcement and Waivers" section of the Code of Conduct, a subsection titled "Disclosures and Waivers" states the following:

If you confront an exceptional situation or circumstance that you believe is not anticipated or fully addressed by the guidance contained in this Code of Conduct or in any other Company policy, the situation must be raised through the General Counsel who will review in turn with the Chief Executive Officer as applicable.

Violations of law may subject employees and the Company to civil and criminal penalties. Thus, waivers of any requirement of our Code will only be granted in exceptional circumstances, after disclosure through the General Counsel and careful consideration followed by an appropriate review by the Chief Executive Officer and as appropriate in certain cases, the Audit Committee of the Company's Board of Directors or the full Board.

### Duties Pursuant to the Audit Committee Charter

125.     In addition to the duties set forth in the Code of Conduct, Defendants Longstreth, Mohamed, Morgan, Shaper, and Yang (the "**Audit Committee Defendants**"), who served on the Audit Committee during the Relevant Period, owed specific duties to Sunnova under the Charter of the Audit Committee of Sunnova Energy International, Inc.[3] (the "**Audit Committee Charter**"), as set forth in part below.

126.     Specifically, the Audit Committee Charter provides that the purpose of the Audit Committee is to:

[A]ssist the Board with oversight of: the quality and integrity of the Company's financial statements; compliance with legal and regulatory requirements; the review of the Company's independent registered auditors' qualifications and independence; the review of the Company's independent registered auditors' qualifications and independence; the review of the performance of the Company's independent registered auditors and internal audit function; the design and implementation of the Company's internal audit function; risks relating to financial matters, financial reporting and auditing, the corporate ethics and compliance program, and cybersecurity; and the Company's enterprise risk management ("ERM") process.

---

[3] *See* Charter of the Audit Committee of Sunnova Energy International, Inc. at: https://s23.q4cdn.com/546214306/files/doc_downloads/governance/2022/07/SEI-2022-07-26-Audit-Committee-Charter.pdf.

127.     The Audit Committee Charter also states:

> The primary role of the Committee is to oversee the financial reporting and disclosure process. To fulfill this obligation, the Committee relies on: management for the preparation and accuracy of the Company's financial statements; both management and the Company's internal audit department for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures and applicable laws and regulations; and the Company's independent auditors for an unbiased, diligent audit or review, as applicable, of the Company's financial statements and the effectiveness of the Company's internal controls. The members of the Committee are not employees of the Company and are not responsible for conducting the audit or performing other accounting procedures.

128.     The Audit Committee Charter outlines the Audit Committee's duties and responsibilities. Under the "Independent Auditors" section, it states "[t]he Committee shall have the following authority and responsibilities:

> To (1) select and retain an independent registered public accounting firm to act as the Company's independent auditors for the purpose of auditing the Company's annual financial statements, books, records, accounts and internal controls over financial reporting, (2) set the compensation of the Company's independent auditors, (3) oversee the work done by the Company's independent auditors, who shall report directly to the Committee and (4) terminate the Company's independent auditors, if necessary.

> To select, retain, compensate, oversee and terminate, if necessary, any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

> To approve all audit engagement fees and terms; to pre-approve all audit and permitted non-audit and tax services that may be provided by the Company's independent auditors or other registered public accounting firms; and to establish policies and procedures for the Committee's pre-approval of permitted services by the Company's independent auditors or other registered public accounting firms on an on-going basis.

At least annually, to obtain and review a report by the Company's independent auditors that describes (1) the accounting firm's internal quality control procedures, (2) the accounting firm's independence, including any material issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the firm and any steps taken to deal with any such issue, and (3) the accounting firm's independence, including all relationships between the firm and the Company or any of its subsidiaries; and to discuss with the independent auditors this report and any relationships or services that may impact the objectivity and independence of the auditors.

At least annually, to evaluate the qualifications, performance and independence of the Company's independent auditors, including considering whether the firm's quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the firm's independence. The Committee shall be responsible for performing a review and evaluation of the lead audit partner and shall assure the regular rotation of the lead audit partner of the Company's independent auditors as required by law and consider regular rotation of the accounting firm serving as the Company's independent auditors.

To review and discuss with the Company's independent auditors (1) the auditors' responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process, (2) the overall audit strategy, (3) the scope and timing of the annual audit, (4) any significant risks identified during the auditors' risk assessment procedures, and (5) when completed, the results, including significant findings, of the annual audit.

To review and discuss with the Company's independent auditors (1) all critical accounting policies and practices, (2) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the auditors, and (3) other material written communications between the auditors and management. To review and discuss with the Company's independent auditors and management (1) any audit problems or difficulties, including difficulties encountered by the Company's independent auditors during their audit work (such as restrictions on the scope of their activities or their access to information), (2) any

significant disagreements with management, and (3) management's response to these problems, difficulties or disagreements; and to resolve any disagreements between the Company's auditors and management.

To review with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements. To keep the Company's independent auditors informed of the Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company as reviewed and approved by the Nominating and Corporate Governance Committee; and to review and discuss with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

To review and discuss with the Company's independent auditors any other matters required to be discussed by PCAOB Auditing Standards No. 1301, Communications with Audit Committees, including, without limitation, the auditors' evaluation of the quality of the Company's financial reporting, information relating to significant unusual transactions and the business rationale for such transactions and the auditors' evaluation of the Company's ability to continue as a going concern.

To review with management the ESG-related disclosures contained within the Company's financial statements, securities filings and other public disclosures which may be relied upon by investors and the procedures to assure the accuracy and reasonable achievability of those statements and disclosures.

129. The Audit Committee Charter outlines the Audit Committee's duties and responsibilities. Under the "Financial Reporting" section, it states the Audit Committee must:

[R]eview with management, the internal audit department and the Company's independent auditors the adequacy and effectiveness of

the Company's financial reporting processes and internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures, and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures.

[R]eview and discuss with the Company's independent auditors and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the auditors on the financial statements and disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K before the Form 10-K is filed and recommend to the Board whether the Company's annual audited financial statements and accompanying notes should be included in the Form 10-K.

[R]eview and discuss with the Company's independent auditors and management the Company's quarterly financial statements and disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed.

[P]repare and approve the Committee's report as required by the Securities and Exchange Commission to be included in the Company's proxy statement for the annual stockholders meeting (or in the Company's Annual Report on Form 10-K if required to be included therein).

[R]eview and discuss with management the Company's earnings press releases, as well as financial information and earnings guidance provided to investors, analysts or rating agencies.

130.    The Audit Committee Charter outlines the Audit Committee's duties and responsibilities. Under the "Internal Audit and Human Resources" section, it states the Audit Committee must:

[R]eview, discuss with the Company's independent auditors, and approve the functions of the Company's internal audit department, including its purpose, organization, staffing, responsibilities, budget

and performance; and to review the scope, performance and results of such department's internal audit plans, including any reports to management and management's response to those reports; and to review and approve the hiring or dismissal of the head of Internal Audit.

[S]et clear Company hiring policies for employees or former employees of the Company's independent auditors that participated in any capacity in any Company audit.

131.     The Audit Committee Charter outlines the Audit Committee's duties and responsibilities. Under the "Compliance and Risk Management" section, it states the Audit Committee must:

[E]stablish and oversee procedures for the receipt, retention and effective handling of complaints received by the Company regarding financial, accounting, internal controls or auditing matters or violations of law, company policy, and unethical business practices; to ensure that the complaint reporting process and procedures reasonably protect the ability of reporters to submit confidential, anonymous reports and be free from retaliation based on a good faith report or by reason of cooperation with the Company's investigation of such complaints; and, to ensure timely consultation with and input from the Committee on serious issues, establish a list of the allegations and compliance issue types requiring immediate and continuing notification of the Committee Chair.

[O]versee and monitor the strategy, resources and effectiveness of the Company's program to achieve compliance with applicable laws and regulations and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal, ethical and regulatory compliance; to establish a regular reporting cadence for the Company to provide reports on the effectiveness of the compliance program and key controls;; and to review and approve the hiring or dismissal of any Chief Compliance Officer.

[O]versee and ensure that management has established an ERM process reasonably designed and implemented to reliably identify and assess the critical risks and opportunities facing the Company; to ensure that the risk identification and assessment process incorporates not only potential risks to the Company's strategy, operations, compliance with law and financial performance but also the material risks posed through adverse impact on the Company's

stakeholders; and to actively monitor the effectiveness of the Company in mitigating critical and material risks to the Company and its key stakeholders, except as to those risks for which oversight has been assigned to other committees of the Board.

[R]eview with management the effectiveness of (a) the Company's cyber security frameworks, policies, programs, opportunities, and risk profile; and (b) the Company's business continuity and disaster recovery plans and capabilities and the effectiveness of the Company's escalation procedures.

[R]review, with the General Counsel and outside legal counsel, legal and regulatory matters not otherwise overseen by the Board or another committee, including legal cases against or regulatory investigations of the Company and its subsidiaries, that could have a significant impact on the Company and its stakeholders or on the Company's financial statements, internal controls or compliance policies or programs.

132.     The Audit Committee Charter outlines the Audit Committee's duties and responsibilities. Under the "No Duty to Conduct Audits" section, it states:

> While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. This is the responsibility of management and the independent auditors. Nor is it the duty of the Committee to conduct investigations or to resolve disagreements, if any, between management and the independent auditors or to assure compliance with laws and regulation and the Company's codes of conduct and ethics. Therefore, the Committee's responsibility is in the nature of oversight, and in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurances as to the Company's financial statements or the work of the independent auditors. Absent actual knowledge to the contrary (which shall be promptly reported to the Board), each member of the Committee shall be entitled to assume and rely upon (1) the integrity of those persons and organizations within and outside the Company from which it receives information, and (2) the accuracy of the financial and other information provided to the Committee by such persons and organizations.

133. While the Audit Committee had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, it failed to fulfill these responsibilities. In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

### The False and Misleading Proxy Statements

134. In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements filed on April 8, 2021 (the "**2020 Proxy**"), April 7, 2022 (the "**2021 Proxy**"), April 6, 2023, (the "**2022 Proxy**"), and April 4, 2024 (the "**2023 Proxy**"). The 2020 Proxy, 2021 Proxy, 2022 Proxy, and 2023 Proxy are collectively referred to herein as the "**Proxies**."

135. The 2020 Proxy recommended that shareholders vote to elect Defendants Brownell, Longstreth, and Shaper to serve a three-year term until the 2024 annual meeting. It also recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2021 fiscal year.

136. The 2021 Proxy recommended that shareholders vote to elect Defendants Andrew, Mohamed, and Yang to serve a three-year term until the 2025 annual meeting. It also recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2022 fiscal year.

137. The 2022 Proxy recommended that shareholders vote to elect Defendants Berger, D'Argenio and Morgan to serve a three-year term until the 2026 annual meeting. It also recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 fiscal year.

138.    The 2023 Proxy recommended that shareholders vote to elect Defendants Brownell and Shaper to serve a three-year term until the 2027 annual meeting. It also recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 fiscal year.

139.    The 2020 Proxy stated the following regarding the Board's role in risk oversight at the Company:

> Our Board has oversight responsibility of the processes established to report and monitor material risks applicable to us. Our Audit Committee assists our Board in oversight of the integrity of the Company's financial statements, our compliance with legal and regulatory requirements and the review of our internal auditors and independent registered public accounting firm. Certain risks associated with the performance of our executive management fall within the authority of our Nominating and Corporate Governance Committee, which is responsible for evaluating potential conflicts of interest and independence of directors and Board of Directors candidates, monitoring and developing corporate governance principles and overseeing the process by which our Board, our Chief Executive Officer and our executive management are evaluated. Risks associated with retaining executive management fall within the scope of the authority of our Compensation Committee, which assists our Board in reviewing and administering compensation, benefits, incentive and equity−based compensation plans. To assist in satisfying these responsibilities, the Compensation Committee has retained its own independent compensation consultant and meets regularly with management to understand the financial, human resources and stockholder implications of compensation decisions being made. Responsibility for risk oversight that does not fall within the scope of authority of the three standing committees of our Board rests with our entire Board. Our Board also has the responsibility for monitoring and assessing any potential material risks identified by its committees, or otherwise ensuring management is monitoring and assessing, and, to the extent appropriate, mitigating such risks. Risks falling within this area include, but are not limited to, general business and industry risks, operating risks, financial risks and compliance risks.
>
> Our Board has delegated to management the responsibility to manage risk and bring to the attention of our Board the most material risks to our Company. We do not assign the responsibility for all

risk management to a single risk management officer within our executive management. Rather, we rely on executive management to administer an enterprise risk management program (the "ERM program") that is designed to ensure that all significant risks to the Company, on a consolidated basis, are being managed and monitored appropriately. Our Internal Audit Department oversees an annual enterprise risk assessment (the "ERA"). The ERA is designed to identify the portfolio of the Company's business risks, to individually evaluate their likelihood of occurrence, and to identify existing and potential future mitigation strategies. The ERM program assesses the potential magnitude of the most significant risks identified in the ERA, identifies other operational, commercial, macroeconomic and geopolitical risks facing the Company, monitors key indicators to assess the effectiveness of the Company's risk management activities, and manages risks to be within the Company's desired risk profile. Meetings are held at least quarterly to discuss risk mitigation efforts to manage identified risks. The management team present in the risk management meetings includes our Executive Vice President and Chief Financial Officer, Executive Vice President, General Counsel and Secretary, and the other members of our management team charged with evaluating the Company's disclosure controls. Meetings are facilitated by our Internal Audit Department head. Our Board monitors the ERM program and other risk management information provided to it to assess the Company's risk management practices and systems in light of the risk philosophy and risk tolerance of our Board. The ERM program results are reported to our Board each quarter to assist in its oversight of risk management.

140.    The 2020 Proxy stated the following regarding the Company's Code of Ethics:

Included with our Corporate Governance Guidelines detailed on our website, www.sunnova.com, and available in print to any stockholder who requests a copy, are our Code of Conduct and our Code of Ethics for the Chief Executive Officer and Senior Financial Officers. We intend to satisfy the disclosure requirement regarding any changes in these codes of ethics we have adopted and/or any waiver therefrom by posting such information on our website or by filing a Form 8-K for such events.

141.    The 2021 Proxy, 2022 Proxy, and 2023 Proxy contained similar provisions to the 2020 Proxy regarding risk oversight and the Audit Committee's role in risk assessment and risk management.

142.     Defendants Berger, Brownell, Shaper, D'Argenio, Morgan, Andrew, Mohamed, Yang, Kimmelman and Longstreth caused the Proxies to be false and misleading by failing to disclose that: (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the Proxies claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Individual Defendants violated the Code of Conduct with no consequences.

143.     Defendants Berger, Brownell, Shaper, D'Argenio, Morgan, Andrew, Mohamed, Yang, Kimmelman, Longstreth caused the Proxies to by false and misleading and failed to disclose material facts necessary to make the statement therein not false and misleading. Specifically, the Proxies failed to disclose, *inter alia*, that: (i) Sunnova routinely engaged in predatory business practices against disadvantaged homeowners and communities, the same groups that Project Hestia was purportedly intended to benefit; (ii) the forgoing conduct subjected the Company to a heightened risk of regulatory and governmental scrutiny, as well as significant reputational and/or financial harm; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

144.     As a result of the Company's false and misleading statements in the Proxies, the Company's stockholders made uninformed decisions when voting to reelect the Individual Defendants as proposed in the Proxies.

## BREACHES OF DUTIES

145.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Sunnova, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

146.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding Sunnova's predatory business against disadvantaged homeowners and communities as described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Sunnova substantial damage.

147.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Sunnova's public statements and internal control function.

148.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Sunnova, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, Sunnova has expended, and will continue to expend, significant sums of money.

## DAMAGES TO SUNNOVA

149.    As a direct and proximate result of the Individual Defendants' conduct, Sunnova has expended and will continue to expend significant sums of money.

150.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and money expended to comply with congressional investigations.

151.    As a direct result of the Individual Defendants' conduct, Sunnova has suffered and will continue suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

152.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

153.    Plaintiff brings this action derivatively and for the benefit of to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sunnova, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

154.    Sunnova is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

155.    Plaintiff is, and has been continuously at all relevant times, a stockholder of Sunnova. Plaintiff will adequately and fairly represent the interests of Sunnova in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

156.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

157.     A pre-suit demand on the Board of Sunnova is futile and, therefore, excused. At the time of filing this action, the Board consists of eight directors: (i) Berger, (ii) Andrew, (iii) Brownell, (iv) D'Argenio, (v) Mohamed, (vi) Morgan, (vii) Shaper, and (viii) Yang (the "**Current Director Defendants**"). Plaintiff needs only to allege demand futility as to a majority of the directors who are on the Board at the time this action is commenced.

158.     Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

159.     Demand is excused as to all of the Current Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they, knowingly or recklessly, made and/or caused the Company to make false and misleading statements and omissions of material facts regarding Sunnova's predatory business against disadvantaged homeowners and communities as described herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. The Current Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested. Demand upon them is futile and thus excused.

160.     Moreover, Defendants Berger, Andrew, D'Argenio, Morgan, and Shaper signed the 2019 10-K. Defendants Berger, Andrew, Brownell, D'Argenio, Mohamed, Morgan, and Shaper signed the 2020 10-K. All of the Current Director Defendants signed the 2021 10-K and 2022 10-K. All these financial disclosures contained false and materially misleading statements and/or omitted facts, as alleged herein. Accordingly, the Current Director Defendants made the false and misleading statements contained in those financial statements, breached their fiduciary duties, and

face a substantial likelihood of liability. Thus, demand upon all the Current Director Defendants is futile and therefore excused.

161.    Further, Defendant Berger and the Audit Committee Defendants solicited the Proxies. The Proxies were false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

## A.  The Board Faces a Substantial Likelihood of Liability

162.    Demand is excused as to all the Current Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability. In complete abdication of their fiduciary duties, the Current Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make materially false and misleading statements regarding the Company's predatory business practices against disadvantaged homeowners and communities. Specifically, the Current Director Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing the Company's financial well-being and prospect from the investing public and supporting the artificially inflated price of Sunnova's securities. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Current Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested, and demand upon them is futile, and thus excused.

163.    Specifically, Defendants Berger, Andrew, D'Argenio, Morgan, and Shaper signed the 2019 10-K. Defendants Berger, Andrew, Brownell, D'Argenio, Mohamed, Morgan, and Shaper signed the 2020 10-K. All the Current Director Defendants signed the 2021 10-K and 2022 10-K. All of these financial statements contained false and misleading statements and/or omitted material facts, as alleged herein. Accordingly, all of the Current Director Defendants made false

and misleading statements, breached their fiduciary duties and face a substantial likelihood of liability. Thus, demand upon all of the Current Director Defendants is futile and therefore excused.

164.    The Current Director Defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

165.    Additionally, the Current Director Defendants willfully ignored, recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

166.    Defendants Berger, Andrew, D'Argenio, Morgan, and Shaper: 1) authorized, signed, and/or permitted the false and misleading statements described herein, including the Company's 2019 10-K to be disseminated directly to the public and made available and distributed to shareholders; 2) authorized and/or permitted the issuance of various false and misleading statements; and 3) are principal beneficiaries of the wrongdoing alleged herein. Thus, Defendants Berger, Andrew, D'Argenio, Morgan, and Shaper could not fairly and fully prosecute such a suit even if they instituted it.

167.    Defendants Berger, Andrew, Brownell, D'Argenio, Mohamed, Morgan, and Shaper authorized, signed, and/or permitted the false and misleading statements described herein, including the Company's 2020 10-K to be disseminated directly to the public and made available and distributed to shareholders; 2) authorized and/or permitted the issuance of various false and misleading statements; and 3) are principal beneficiaries of the wrongdoing alleged herein. Thus, Defendants Berger, Andrew, Brownell, D'Argenio, Mohamed, Morgan, and Shaper could not fairly and fully prosecute such a suit even if they instituted it.

168.    All the Current Director Defendants authorized, signed, and/or permitted the false and misleading statements described herein, including the Company's 2021 10-K and 2022 10-K to be disseminated directly to the public and made available and distributed to shareholders; 2) authorized and/or permitted the issuance of various false and misleading statements; and 3) are principal beneficiaries of the wrongdoing alleged herein. Thus, the Current Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

169.    The Current Director Defendants, as members of the Board, were and are subject to Sunnova's Code of Conduct. The Current Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Current Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

170.    The four current directors who engaged in insider trading (Defendants Berger, D'Argenio, Morgan, and Shaper) also face a substantial likelihood of liability because they did so with scienter.

**B.  Four of the Eight Directors Materially Benefitted from Insider Trading**

171.    Demand is excused as to the Fourth Claim (breach of fiduciary duty under insider trading) and the Fifth Claim (unjust enrichment) as against defendants Berger, D'Argenio, Morgan, and Sharper each received a material personal benefit from this alleged misconduct. Specifically:

172.    Defendant Berger reaped over $4.5 million from insider sales. This is material to him because it amounts to over **seven** times his $620,833 salary and approximately 0.75 times his total compensation from the Company for the 2023 fiscal year.

173.     D'Argenion avoided losses of almost $496.8 million by selling his stock before the MNPI was disclosed to the public.

174.     Defendant Morgan reaped over $6.4 million from insider sales. This is material to him because it amounts to over **97** times his $66,411 in fees and over **34** times his total compensation from the Company for the 2023 fiscal year.

175.     Defendant Shaper reaped over $13.9 million from insider sales. This is material to him because it amounts to over **175** times his $74,456 in fees and over **69** times his total compensation from the Company for the 2023 fiscal year.

176.     The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

177.     Furthermore, Defendant Berger is Sunnova's founder and CEO, and has been a director as all relevant times. The Company provides Berger with significant compensation for his position at the Company, as detailed above. As CEO, Berger was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K, which he signed. Moreover, Berger solicited the Proxies, which contained material misrepresentations and omissions and contributed to the reelection of himself, Defendants Andrew, Brownell, D'Argenio, Mohamed, Morgan, Shaper and Yang, allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. Berger also engaged in insider trading, selling approximately 150,000 shares of artificially inflated Company common stock for personal profits more than $4.5 million. Furthermore, Berger is a defendant in the Securities Class Action. As a result, Berger received a

material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Berger is futile and excused.

178.    Defendant Andrew has served as a Company director since October 2019. The Company provides Defendant Andrew with significant compensation for her role at the Company, as detailed above. As such, Defendant Andrew cannot independently consider any demand to sure herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Andew render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she also consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Andrew received a material personal benefit, breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Andrew is excused.

179.    Defendant Brownell has served as a Company director since October 2020. The Company provides Defendant Brownell with significant compensation for her role at the Company, as detailed above. As such, Defendant Brownell cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Brownell render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she also consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Brownell received a material personal benefit, breached her fiduciary duties, faces a substantial likelihood

of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Brownell is excused.

180.    Defendant D'Argenio served as a Company director since June 2019. Through his position as a Board member of the Company and as a Partner of Energy Capital Partners, Defendant D'Argenio cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant D'Argenio through his position at Energy Capital Partners, render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he also consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. D'Argenio, through his affiliation with Energy Capital Partners, also engaged in insider trading, selling over 27.4 million shares of artificially inflated Company common stock for proceeds of over $782 million. As a result, Defendant D'Argenio received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant D'Argenio is excused.

181.    Defendant Mohamed served as a Company director since December 2020. The Company provides Defendant Mohamed with significant compensation for his role as stated above. As such, Defendant Mohamed cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Mohamed render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he also consciously disregarded his duties to protect

corporate assets, by conducting little, if any, oversight, to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Mohamed received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Mohamed is excused.

182.    Defendant Morgan served as a Company director since June 2019. The Company provides Defendant Morgan with significant compensation for his role as stated above. As such, Defendant Morgan cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Morgan render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he also consciously disregarded his duties to protect corporate assets, by conducting little, if any, oversight, to prevent the scheme that caused the Company to make false and misleading statements. Morgan also engaged in insider trading, selling over 161,000 shares of artificially inflated Company common stock for proceeds of over $6.4 million. As a result, Defendant Morgan received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Morgan is excused.

183.    Defendant Shaper served as a Company director since June 2019. The Company provides Defendant Shaper with significant compensation as stated above. As such, Defendant Shaper cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Shaper render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company

director, he also consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. Shaper also engaged in insider trading, selling approximately 500,000 shares of artificially inflated Company common stock for proceeds of over $13.9 million. As a result, Defendant Shaper received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Shaper is excused.

184.    Defendant Yang served as a Company director since October 2021. The Company provides Defendant Yang with significant compensation for her role as stated above. As such, Defendant Yang cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Yang render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she also consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Yang received a material personal benefit, breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Yan is excused.

185.    Furthermore, Defendants, Mohamed, Morgan, Shaper, and Yang have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity of Sunnova's financial statements. Specifically, Audit Committee Charter provides that the Audit Committee is responsible for:

> [A]assist[in] the Board with oversight of: the quality and integrity
> of the Company's financial statements; compliance with legal and

regulatory requirements; the review of the Company's independent registered auditors' qualifications and independence; the review of the Company's independent registered auditors' qualifications and independence; the review of the performance of the Company's independent registered auditors and internal audit function; the design and implementation of the Company's internal audit function; risks relating to financial matters, financial reporting and auditing, the corporate ethics and compliance program, and cybersecurity; and the Company's enterprise risk management ("ERM") process.

The primary role of the Committee is to oversee the financial reporting and disclosure process. To fulfill this obligation, the Committee relies on: management for the preparation and accuracy of the Company's financial statements; both management and the Company's internal audit department for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures and applicable laws and regulations; and the Company's independent auditors for an unbiased, diligent audit or review, as applicable, of the Company's financial statements and the effectiveness of the Company's internal controls. The members of the Committee are not employees of the Company and are not responsible for conducting the audit or performing other accounting procedures.

186.    In their capacities as Audit Committee members, Defendants Mohamed, Morgan, Shaper, and Yang reviewed and approved the materially misleading statements and allowed them to be disseminated in Sunnova's SEC filings and other disclosures. Thus, Defendants, Mohamed, Morgan, Shaper, and Yang breached their fiduciary duties, are not disinterested, and demand is excused as to them for this additional reason.

187.    In violation of the Code of Conduct, the Current Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity,

failing to avoid conflict of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

188.     Sunnova has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Director Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Snowflake any part of the damages Snowflake suffered and will continue to suffer thereby. Thus, any demand upon the Current Director Defendants would be futile.

189.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Current Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Current Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

## **FIRST CLAIM**

**Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

190.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

192. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

193. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

194. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies,

including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

195.   The false and misleading elements of the annual Proxies led to the re-elections of several of the Individual Defendants to the Board as well as the ratification of an independent auditor, allowing them to continue breaching their fiduciary duties to Sunnova.

196.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

197.   Plaintiff, on behalf of Sunnova, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

198.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.   The Individual Defendants, by virtue of their positions with Sunnova and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Sunnova and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Sunnova to engage in the illegal conduct and practices complained of herein.

200.   Plaintiff, on behalf of Sunnova, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

201.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

74

202.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sunnova's business and affairs as directors and/or officers of the Company.

203.     Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision, causing the Company to engage in the misconduct described herein.

204.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

205.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

206.     The Individual Defendants engaged in a sustained, systemic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sunnova has sustained and continues to sustain significant damages. The Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities litigation, sever damages to the share price of the Company's stock, and an increased cost of capital. As result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208.     Plaintiff, on behalf of Sunnova, has no adequate remedy at law.

## FOURTH CLAIM

**Against Defendants Berger, D'Argenio, Kimmelman Longstreth, Morgan, and Shaper**
*for Breach of Fiduciary Duty by Insider Trading*

209.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.     Defendants Berger, D'Argenio, Kimmelman, Longstreth, Morgan, and Shaper owed the Company duties of loyalty, good faith, and care as officers and directors of the Company. This includes the duty not to trade in the Company's stock on the basis of MNPI. Nevertheless, Defendants Berger, D'Argenio, Kimmelman, Longstreth, Morgan, and Shaper traded in the Company's stock while in possession of the MNPI described herein, reaping proceeds of nearly $1 billion.

211.     As alleged above, Defendants Berger, D'Argenio, Kimmelman, Longstreth, Morgan, and Shaper are Sunnova's fiduciaries, possessed MNPI from Sunnova, and used that information to improperly profit from sales of Sunnova stock. These defendants directed their stock sales set forth above due in whole or in part to their knowledge of the substance of the MNPI that they possessed.

212.     Defendants Berger, D'Argenio, Kimmelman, Longstreth, Morgan, and Shaper knew that the investing public was unaware of the negative material information that they possessed when they sold their Sunnova stock. They also knew that, if the information were disclosed, the market price of Sunnova stock would be significantly lower. These defendants timed their stock sales to take advantage of the public's ignorance of the concealed facts described herein and obtain a higher price for the stock they sold, thus benefiting by misappropriating the Company's confidential information.

213.     As a direct and proximate result of the misconduct of Defendants Berger, D'Argenio, Longstreth, Kimmelman, Morgan, and Shaper, Sunnova has sustained significant damages, as alleged herein.

214.     Plaintiff, on behalf of Sunnova, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

215.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.     By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Sunnova.

217.     The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Sunnova tied to the performance or artificially inflated valuation of Sunnova, or received compensation that was unjust in light of Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

218.     Moreover, Defendants Berger, D'Argenio, Kimmelman, Longstreth, Morgan, and Shaper unjustly enriched themselves by selling nearly $1 billion of Sunnova common stock, inflated as a result of the Company's issuance of the false and misleading statements described herein.

219.     Plaintiff, as a stockholder and a representative of Sunnova, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

220.     Plaintiff, on behalf of Sunnova, has no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Sunnova, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that Individual Defendants have breached their fiduciary duties to Sunnova;

C.     Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

D.     Finding that the Individual Defendants have been unjustly enriched;

E.     Determining and awarding to Sunnova the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

F.     Directing Sunnova and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable

laws and protect Sunnova and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

G.  Awarding Sunnova restitution from Individual Defendants;

H.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.  Granting such other and further relief as the Court may deem just and proper.

Dated: June 18, 2024                    Respectfully submitted,

**CONDON TOBIN SLADEK**
**THORNTON NERENBERG PLLC**

 _/s/ Stuart L. Cochran_
Stuart L. Cochran
Texas Bar No. 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3804
Email: scochran@condontobin.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
Correy A. Suk (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
Sidharth Kakkar (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, NY 10004
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com
skakkar@zlk.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Patrick Ayers, under penalty of perjury, hereby declare that I am a plaintiff in the foregoing Verified Stockholder Derivative Complaint (the "Complaint") that I have read the Complaint, and that the facts therein are true to my own knowledge, except as to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Date:   June _18_, 2024

Patrick Ayers

Patrick Ayers